**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


**Brenda L. Corson**

    **v.**                        Civil No. 12-cv-371-PB
                                       Opinion No. 2013 DNH 144

**U.S. Social Security Administration,
Commissioner**


**MEMORANDUM AND ORDER**


Brenda Corson seeks judicial review of a ruling by the
Commissioner denying her application for disability insurance
benefits ("DIB") because she failed to prove that she was
disabled at any point prior to September 30, 1998, the last date
that she was eligible for DIB.  Corson claims that the
Administrative Law Judge ("ALJ") failed to properly credit
evidence from a treating medical source and failed to properly
consider lay evidence.  She additionally argues that the ALJ's
residual functional capacity ("RFC") assessment is not supported
by substantial evidence because it failed to account for all of
Corson's functional limitations.  For the reasons set forth
below, I deny Corson's request and affirm the decision of the
Commissioner.

## I.   BACKGROUND[1]

### A.   Procedural History

Corson originally applied for DIB on August 5, 2002, alleging a disability onset date of July 22, 1994.  After the Commissioner denied her application on August 27, 2002, ALJ Ruth Kleinfeld held a hearing on September 18, 2003.  Corson, represented by an attorney, testified along with her daughter-in-law.  On April 30, 2004, the ALJ issued a decision finding that Corson was not disabled between the alleged onset date of her disability and September 30, 1998, her date last insured ("DLI").[2]  After the Appeals Council denied Corson's request for review, this court issued a remand order, finding that the ALJ's decision was not supported by substantial evidence.  Endorsed Order, Corson v. Soc. Sec. Admin., Comm'r, No. 04-cv-357 (D.N.H. June 29, 2005).  The Appeals Council then vacated the earlier decision and remanded the case.

The ALJ held a second hearing on September 7, 2006.  Corson was absent, but her attorney appeared, as well as a medical

---

[1] The background information is taken from the parties' Joint Statement of Material Facts (Doc. No. 13).  Citations to the Administrative Transcript are indicated by "Tr."

[2] In order to be eligible for DIB under the Social Security Act, Corson must demonstrate that she was disabled on or prior to her date last insured.  See 42 U.S.C. § 423(c) .

expert and vocational expert.  On February 25, 2008, the ALJ issued a second decision finding that Corson was not entitled to benefits.  This court then remanded the case a second time on a motion by the Commissioner, and the Appeals Council subsequently vacated the earlier decision and remanded the case.[3]

On June 8, 2010, ALJ Edward Hoban held a hearing at which Corson, represented by an attorney, testified.  Corson's friend Cynthia Vandermark also testified, as did medical expert Dr. Gerald Koocher and vocational expert Christine Spaulding.  On September 24, 2010, the ALJ issued a decision finding Corson not disabled at any time between her alleged onset date and her DLI. On July 12, 2012, the Appeals Council declined to assume jurisdiction, making the ALJ's decision the Commissioner's final decision and therefore subject to judicial review.

B.   **Medical History**

Corson was forty-four years old on her alleged onset date and forty-nine years old on her DLI.  She has a high school education and past relevant work as a housekeeper and laundry worker.  Although Corson originally claimed physical

---

[3] The Commissioner moved for a limited remand to reevaluate whether Corson's prior position as a file clerk constituted past relevant work.  The court granted the motion subject to a broader scope, noting that the ALJ could revisit any issue he or she deemed appropriate.  Endorsed Order, Corson v. Astrue, Comm'r of Soc. Sec., No. 08-cv-441 (D.N.H. June 18, 2009).

incapacitation along with her mental ailments, her arguments
here rest solely upon her alleged pre-DLI mental impairments.[4]

    1.   Treatment Summary, 1996-2005

    On August 19, 1996, Corson arrived without an appointment
at Community Medical Associates of Concord ("CMAC"), where she
had previously been treated for a back injury.  She was crying
and stated that she was tired, not feeling well, and having
trouble with her husband.  Tr. at 191.  Corson described herself
as "dirty and unkempt," but the examining doctor, Dr. Benson,
disagreed with her self-assessment, noting that she was "hardly
so."  Dr. Benson diagnosed Corson as depressed and started her
on antidepressant medication, and on a visit later that month he
prescribed two additional medications to treat anxiety and
depression.  Id.

    On August 27, 1996, Corson returned to CMAC and was treated
by Linda Douville, a nurse practitioner.  Corson complained that
she felt tearful all the time, unlike herself, bored with her
life, and feared people snooping outside of her home.  She also
reported continuing marital problems.  In September, Dr. Benson

---

[4] Corson originally alleged back pain as a basis for disability,
but now only challenges the ALJ's assessment of her mental
impairments.  I thus need not address Corson's physical work
capacity.  See Brun v. Shalala, No. 93-320-B, 1994 WL 504305, at
*1 n.3 (D.N.H. July 29, 1994) (citing Alan Corp. v. Int'l
Surplus Lines, Inc., 22 F.3d 339, 343 n.4 (1st Cir. 1994)).

advised Corson to remain on the same medications and to seek counseling.  Later in the month, Corson told Douville that she had stopped taking two of her prescribed medications due to headaches, but continued taking the third in order to sleep. She stated that she was feeling better about her relationship with her husband, whose physical and verbal abuse were allegedly at the root of many of her problems.  Id. at 192.

On October 9, 1996, Corson discussed her marital problems with Dr. Benson and reported that her husband did not want her to work.  Id. at 193.  Later that month, Corson told Douville that she was in better spirits and was contemplating working part-time over the holidays, which Douville encouraged.  On November 21, 1996, Douville reported that Corson's depression had resolved and encouraged Corson to get a driver's license and seek employment.  Id. at 194.

On February 3, 1997, Corson again reported trouble eating, sleeping, and difficulties with her husband, and Dr. Benson restarted her on a second medication for depression.  By mid-month, Corson reported that she felt better but still tearful, and Dr. Benson restarted her on the third medication.  Corson reported being happier that March and continued taking her medication.  In September 1998 Corson told Douville that she was "doing fine" and was back working.  Id. at 200.

On February 10, 1999, Corson told Douville that she was stressed because her husband did not want her to work outside of the home.  Corson requested a replacement for two of her medications due to headaches and she started a different antidepressant.  That March, Corson told Douville that she had significant relief from anxiety while on her new medication, and in September she told Douville that she felt more social. Corson reported doing well on her new medication through late 2001.  Id. at 200-01, 204, 206.

In early 2002, medical authorities were first alerted to potential problems beyond the scope of Corson's previously diagnosed chronic anxiety and depression.  On February 6, 2002, Douville documented a phone call from Corson's son expressing concern for Corson's mental state.  He specifically described two episodes: one in which Corson saw "midgets" looking in the window, the other in which she thought she had been shot.  Id. at 208.

On July 9, 2002, Corson first told Douville that she had been having paranoid episodes manifesting in auditory hallucinations, fear of the dark, and the fear that someone was hurting her.  Id. at 210.  Douville reports that "she has had these symptoms for a very long time, but has been afraid to tell

anybody about it."  Douville referred Corson to Concord

Psychiatry Associates ("CPA") and increased her dose of

antidepressants.

On July 31, 2002, Corson saw Joyce Blood, Ph.D., a nurse

practitioner at CPA.[5]  Id. at 225.  Corson told Blood that she

constantly felt like crying, was afraid of the dark and afraid

to take a shower, and had auditory hallucinations and fears that

people were staring at her.  Corson noted that she felt anxious,

stressed, and depressed, and reported excessive hand washing.

Blood observed that Corson behaved normally and had clear

thought processes, displaying average intelligence with a

depressed and anxious mood.  Blood provisionally diagnosed[6]

Corson with a psychotic disorder, paranoid type, and ruled out

bipolar and obsessive-compulsive disorders.  Id. at 226.

In a medical source statement dated March 26, 2003, Blood

---

[5] The Joint Statement of Material Facts refers to Blood as "Dr.
Blood" because she has a Ph.D.  Doc. No. 13.  Acknowledging her
doctorate in nursing, Tr. at 567, I refer to her as Blood
because she is not a medical doctor, nor a licensed physician or
psychologist for the purpose of diagnosing patients.  See 20
C.F.R. § 404.1513(a).

[6] A "provisional diagnosis" is used in circumstances of
diagnostic uncertainty, when "there is a strong presumption that
the full criteria will ultimately be met for a disorder but not
enough information is available to make a firm diagnosis."  Am.
Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental
Disorders 23 (5th ed. 2013).

opined on Corson's mental ability to accomplish work-related activities.  Id. at 251.  Blood found that Corson had marked restrictions in her ability to understand and remember short, simple instructions and moderate restrictions in her ability to carry them out.  She noted that Corson had marked restrictions in her ability to understand, remember, and carry out detailed instructions; moderate restrictions in her ability to make work-related decisions and to interact appropriately with supervisors and co-workers; and marked restrictions in her ability to interact appropriately with the public and to respond to changing pressures and work conditions.  Blood opined that these limitations were due to Corson's high levels of anxiety and agoraphobia.  Id. at 252.

On September 3, 2003, Blood gave an opinion on Corson's mental impairments for a Social Security prehearing mental impairment questionnaire.  Blood claimed that her opinion applied both presently and prior to September 30, 1998, Corson's DLI.  Id. at 257.  Noting that she saw Corson on a quarterly to monthly basis, Blood reported a delusional disorder with a host of signs and symptoms, including hallucinations, paranoia, and anxiety.[7]  Blood noted that Corson's anxiety decreased while she

---

[7] The list of signs and symptoms that Blood found included: poor memory; appetite, sleep, and mood disturbance; emotional

was on psychotropic medications, and that she currently took an
antidepressant and medication for schizophrenia.  Blood found
that Corson's symptoms were likely to recur, and that she would
likely be absent from work more than three times per month due
to her mental impairments.  Id. at 259.  According to Blood,
almost all of Corson's mental abilities were found to be either
"seriously limited" or "unable to function."  Blood opined that
Corson had no limitations on her ability to do daily tasks, but
marked difficulties in maintaining social functioning, frequent
difficulties with concentration, and repeated episodes of
decompensation in work-like settings.  Id. at 261.  She also
stated that if Corson were awarded benefits she could manage
them in her own best interest.

During the first half of 2005, Blood saw Corson roughly
once a month to discuss Corson's depression and anxiety, both of
which were exacerbated by her husband's recent death.  At that
point, Corson was on five different medications for depression,
insomnia, and schizophrenia.  On July 14, 2005, Dr. Thomas
Meehan, a doctor at CPA, reviewed Corson's records at Blood's

---

liability; hallucinations; recurrent panic attacks; psychomotor
agitation; paranoia; difficulty concentrating; oddities of
thought, perception, speech, or behavior; perceptual
disturbances; social withdrawal; blunt, flat, or inappropriate
affect; illogical thinking; obsessions; persistent irrational
fears; and generalized persistent anxiety.  Tr. at 257.

request.  Dr. Meehan acknowledged that Corson presented psychotic symptoms in 2002 when Blood began treatment and had been ill for about two years before that, but that otherwise Corson's "past history was indicative of generalized anxiety and possibly earlier depression," with "no history of earlier onset psychosis."  Id. at 393.  In his written report, Dr. Meehan affirmed Blood's diagnoses of psychotic disorder, NOS and major depression, noting that he "would probably add Generalized Anxiety Disorder."

### 2.   State Agency and Medical Expert Assessments

On August 27, 2002, state agency psychologist Michael Snyder, Psy.D., opined that the record contained insufficient evidence to determine whether Corson had a psychosis-related mental impairment prior to her DLI.  On October 29, 2007, medical expert Gerald Koocher, Ph.D., opined that Corson appeared to have psychosis with moderate impairments from 2002-2005, but that there was no documentation to support a level of severity beyond moderate, and that her condition seemed to have improved with medication.  Tr. at 426.  Dr. Koocher further stated that the record contained insufficient evidence to determine whether Corson had a psychosis-related mental impairment prior to her DLI.

C.    **Hearing Testimony**

    1.    September 18, 2003 Hearing

    After initially testifying that she had not worked since 1992 because her husband forbade her from working due to her anxiety, Corson testified that she had in fact worked for several months in 1998 making turkey pies, but had left because she did not like the job.  Id. at 61-62.  She stated that she had been hospitalized for a nervous breakdown as a teenager. Describing her mental impairments, Corson noted that during the 1990s she was afraid to take showers and feared people were looking into her home.  She testified that she frequently hallucinated and heard voices.  She did not tell Douville or other medical authorities about her hallucinations because "she was very scared to tell her."  Corson testified that she had told her husband about the hallucinations, but he then told her "it's in your mind," and that she did not know what she was talking about.  Id. at 70.  Medication did not help with the hallucinations.

    Corson's daughter-in-law, Teresa Corson, also testified that she first noticed Corson's problems in 1994 or 1995, when Corson would say she saw aliens or was afraid of people watching her.  Teresa Corson noted that the family spoke about getting Corson help, but that she refused such offers.  Teresa Corson

testified that several times Corson had to be driven from their home in Cape Cod to New Hampshire in the middle of the night due to her anxiety and concerns about aliens or neighbors watching her.  Id. at 84.  Teresa Corson testified that Corson would go two or three months without problems, then in the next several months would mention five different paranoid incidents.  Id. at 85.

### 3.  June 8, 2010 Hearing

Corson again testified that she quit her job making turkey pies because she did not like it, and that she also quit a dishwashing job during the alleged disability period because she could not get along with her brother-in-law as a co-worker.  Id. at 631.  Corson stated that she stopped working in 1992 due to back pain and physical burnout, as well as stress.  She alleged that in 1992 she thought that she was seeing people and things that were not there.  She told her son, husband, and friend about her hallucinations, but did not tell any doctors.  Corson testified that in 1998, her friend Tracy McAllister had to help her shower because of her fears.  When questioned, Corson could not remember an incident from 1994 where her brother- and sister-in-law convinced her to go to the hospital after she alleged to have been shot by a motorcycle gang.

12

Corson's friend Cynthia Vandermark testified to working with Corson from 1989 to 1992, noting that Corson had always been "up and down emotionally" and complained about stress. Vandermark further testified that Corson had always been nervous in public, was afraid that people were watching her, kept her door bolted and blinds and curtains closed, and had difficulty being alone. Id. at 647-50.

Dr. Koocher, a psychologist, testified as a non-examining medical expert that evidence indicated that Corson had a history of mental illness, including anxiety, depression, and some symptoms suggestive of a schizophrenic or psychotic disorder, but none to the extent required by the listings. See 20 C.F.R. pt. 404, subpt. P, app. 1; Tr. at 653-65. Dr. Koocher opined that statements made by Corson's family and friends demonstrated problems before her DLI, but did not provide sufficient information to determine the severity of her impairments. Tr. at 654-55. Although treatment for anxiety and depression were part of Corson's routine medical care before her DLI, the 2002 phone call to Douville was the first mention in the medical record of "something that sound[ed] like a psychotic symptom." Dr. Koocher opined that there was "no sign of hallucinations or delusions reported in the medical record before the date last insured." Id. at 657. According to Dr. Koocher, Corson's daily

13

living, social functioning, and concentration would have been mild to moderately limited as of the DLI, with no evidence of episodes of decompensation of extended duration.  Dr. Koocher also opined that Corson would be able to perform simple work and function socially, and that the statements from Corson's family and other lay testimony evidencing problems with paranoia were "episodic" rather than constant.  Id. at 660.  Dr. Koocher testified that at the time of her DLI, Corson would have been moderately impaired in her ability to interact with the public, respond to work pressures, and attend work punctually and regularly.  Dr. Koocher opined that Corson's depression and anxiety might have interfered with her ability to complete a normal workweek, but not on a regular basis, and that as of her DLI Corson could tolerate occasional interaction with the public and coworkers.

The June 8 hearing also included testimony from Christine Spaulding, a vocational expert.  The ALJ asked questions concerning a hypothetical individual capable of doing light work, limited to simple, repetitive tasks with occasional interaction with coworkers, the public, and supervisors. Spaulding testified that such a person could not do any of Corson's past relevant work, but would be able to perform work as a cleaner, laundry worker, or cafeteria attendant.  Id. at

14

667-68.  She further testified that these jobs could be done by someone who was unable to perform stressful, fast-paced production work.  The ALJ agreed that if Corson had the limitations as described in Blood's assessment, she would be incapable of substantial gainful employment.  Id. at 669.

**D.   <u>Witness Statements</u>**

The record also includes sworn statements by Corson's friends and relatives.  On June 10, 2003, Corson's brother-in-law, John Corson, stated that in June 1994 Corson arrived at his house saying she had been shot in the neck by a motorcycle gang.  She rejected his offer of water, saying it had been poisoned, and would not stay at the hospital when he took her there.  John Corson also stated that claimant drew her curtains at home so people could not spy on her, and that her problems had existed for many years.  Id. at 174.  These statements were echoed in another sworn statement by Lorraine Corson, the claimant's sister-in-law.

On September 6, 2003, Tracy McAllister, the claimant's friend, stated that she met the claimant at work in 1983, and first noticed a change in 1988, when Corson began thinking that people were spying on her.  McAllister stated that in 1990 Corson mentioned seeing aliens, and believed that her sister-in-law spread feces around her bathroom and went through her

15

things.  McAllister helped Corson find a part-time job at a
plumbing company, but Corson had not liked it and quit abruptly.
She stated that Corson was verbally abusive towards her during a
1995 visit and threw things across the room, and that they did
not see each other again until November 2002, when they began
occasionally visiting each other.  Id. at 172.

**E.    ALJ's Decision**

In applying the five-step sequential process required for
evaluating DIB claims, 20 C.F.R. § 404.1520(a)(4)(i-v), the ALJ
found that Corson last met the insured status requirement on
September 30, 1998.  He then found that Corson had not engaged
in substantial gainful activity during the period between her
alleged disability onset date and DLI.

At steps two and three, the ALJ found that Corson had
severe impairments for low back pain, depression, and anxiety,
but that none of her impairments met the listing requirements.
In detail, the ALJ described Corson's visits to her primary care
provider between August 1996, when she first presented
complaints of depression, and 1999, her DLI.  The ALJ next
considered medical expert Dr. Koocher's opinion, noting that the
expert viewed the entire medical record and found that prior to
2002, the medical record only supported diagnoses of depression
and anxiety.  Tr. at 447.  The ALJ then considered post-DLI

16

evidence, including Corson's son's phone call to Douville,
Corson's treatment by Blood for paranoid episodes, and Blood's
retrospective opinion finding the presence of a delusional
disorder prior to Corson's DLI.  He noted that Blood "may not be
an acceptable medical source."  Id.

    After considering this evidence, the ALJ found Dr.
Koocher's testimony consistent with clinical records from CMAC
and the record as a whole.  He agreed with Dr. Koocher's
findings of severe impairments for depression and anxiety.  He
said, however, that he "cannot find, based upon the evidence now
in file, that the claimant had the medically determinable
impairment of a psychotic/delusional disorder . . . as alleged
during the period in question."  To reinforce his decision, the
ALJ noted that Corson did not report symptoms of psychosis to
her primary care provider and was not described as experiencing
such symptoms at any time prior to 2002.  He then considered the
record's lay evidence, giving it "very limited weight" after
noting that the testimony from Corson's brother- and sister-in-
law only described isolated observations from one event that
occurred prior to the alleged disability onset date.  The ALJ
next considered other lay evidence, and reinforced his
assessment by noting that Dr. Koocher considered the lay
opinions before finding that Corson had not suffered from an

impairment prior to her DLI.

After finding that Corson did not have an impairment that met or medically equaled one of the listings, the ALJ next found that through her DLI, Corson had the RFC to perform light work involving simple, repetitive, unskilled tasks with occasional interaction with others in a low-stress, non-production setting. In drawing this conclusion, the ALJ explained that Corson's testimony was not fully credible concerning the "intensity, persistence and limiting effects" of her symptoms, though she attempted to provide information to the best of her abilities. He noted that while testifying, Corson had difficulty recalling specific pertinent instances, and that she had quit the two jobs she worked during the eligibility period because she did not like them or had difficulties getting along with her brother-in-law – not because she was unable to perform the work.

In explaining why he did not factor hallucinations and paranoia into the RFC, the ALJ stated that the medical evidence in the record did not establish the presence of these symptoms at any time prior to the DLI.  The ALJ noted that concerns about such symptoms were raised by a family member in 2002, and next turned to Blood's retrospective diagnosis, which he avowed to have "carefully considered."  Id. at 451.  In affording Blood's opinion only limited weight, the ALJ reasoned that Blood

provided no clinical observations to support her assertion.  He
also noted that the opinion is inconsistent with other
substantial evidence, including that from Corson's primary care
provider and Corson's self-reporting from the time period in
question.

The ALJ next addressed lay testimony, finding that none of
it supported a conclusion that Corson suffered from limitations
beyond the previously found anxiety and depression.  The ALJ
noted that the testimony from Corson's brother- and daughter-in-
law describe only "very isolated events," and acknowledged that
"at times [Corson] was 'perfectly fine.'"  He found that the
testimony from McAllister, Corson's friend, did not specifically
pertain to the eligibility period and that the evidence "does
not establish any ongoing inability to maintain appropriate
social interactions."  He also addressed Vandermark's testimony,
noting that it only established nervousness and that Corson
maintained social interaction throughout the eligibility period.
Id.

The ALJ gave significant weight to medical evidence from
Corson's primary care provider during the eligibility period,
reasoning that "it is the only evidence produced
contemporaneously with the time the claimant alleges she was
disabled."  Id.  He noted the absence of any documented signs of

19

paranoia or delusions, and also considered Corson's self-reporting of her illnesses, as found in the treatment records as the "best evidence" from this time period.  The ALJ also gave considerable weight to the "documented timing" of when delusional symptoms were first reported in 2002, the evidence that Corson first entered into psychiatric treatment in 2002, and "the well-supported opinion of Dr. Koocher."  Id. at 452.

The ALJ found that Corson was unable to perform any of her past relevant work, but that jobs existed in significant numbers in the national economy that Corson could perform.  Thus, the ALJ found that Corson was not disabled at any point from her alleged disability onset date through her DLI.  Id. at 453.

## II.  STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

Findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id.

Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Id. at 770.  Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

    The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record.  Irlanda Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.

    To determine whether an applicant is disabled, the ALJ follows a five-step sequential analysis.  20 C.F.R. § 404.1520. In the context of a claim for social security benefits, disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" expected to result in death or to last for a continuous period of not less than twelve months.  20

21

C.F.R. § 404.1505(a).  The applicant bears the burden, through
the first four steps, of proving that his impairments exist and
preclude him from working.  Freeman v. Barnhart, 274 F.3d 606,
608 (1st Cir. 2001).  At the fifth step, the ALJ determines if
employment exists in significant numbers in the national economy
that the claimant can do despite his or her impairments.  The
ALJ must produce substantial evidence to support that finding.
Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

## III.  ANALYSIS

Corson presents several related arguments in support of her
challenge to the ALJ's decision.  She first argues that the ALJ
failed to properly credit Blood's retrospective opinion as a
treating source in finding no severe impairment for her alleged
delusional disorder.  Corson also maintains that in failing to
find a delusional disorder at step two of his analysis, the ALJ
failed to properly credit lay witness testimony establishing the
existence of psychotic symptoms prior to Corson's DLI.
Relatedly, Corson argues that the ALJ's failure to properly
credit Blood's opinion resulted in an erroneous RFC unsupported
by the existing substantial evidence.  Had he properly credited
Blood's opinion, argues Corson, the ALJ would have found that
Corson was disabled prior to her DLI.  Corson does not dispute

the ALJ's findings concerning her back pain, anxiety, and depression, instead centering her argument upon the ALJ's allegedly inadequate consideration of her psychotic/delusional disorder prior to her DLI.  I conclude that the ALJ gave proper consideration to Blood's testimony and that of the lay witnesses and affirm the ALJ's decision as supported by substantial evidence.

## A.  __Weight of Medical Opinions__

In arguing her case, Corson accurately cites regulations describing the additional weight generally given to examining sources, the factors an ALJ must apply to any medical opinion not given controlling weight, and the requirement that an ALJ give "good reasons" for rejecting a medical opinion.  See 20 C.F.R. § 404.1527(c)(1-6), (d).  As the ALJ noted, however, Blood is not an "acceptable medical source" qualified to give a medical opinion.[8]  See id. §§ 404.1513(a)(1-2), .1527(a)(2).  Acceptable medical sources include licensed physicians or

---

[8] Finding that Blood is not an acceptable medical source does not end my inquiry.  Although objective medical evidence is necessary to establish the existence of a disabling impairment, it is unnecessary to establish the disability onset date. Moriarty v. Astrue, 2008 DNH 158, 14; SSR 83-20, 1983 WL 31249, at *3 (1983).  Although he declined to confirm Blood's retrospective diagnosis of an impairment existing prior to Corson's DLI, Dr. Meehan affirmed her diagnosis of psychotic disorder, NOS as of 2005.  Tr. at 393.

licensed or certified psychologists, but do not include nurse
practitioners, who are considered "other sources."  Id. §
404.1513(a)(1-2), (d).  Despite her doctoral degree, Blood is
neither a physician nor a licensed or certified psychologist.
Her curriculum vitae includes a Ph.D. in nursing and state
certifications as a nurse practitioner in the field of
psychiatric/mental health and as a registered nurse.  Tr. at
567-69.  Because she is not an acceptable medical source, Blood
is also not a "treating source" entitled to the preferential
treatment requested by Corson.[9]  See 20 C.F.R. § 404.1502.

   To be sure, the ALJ is still required to consider Blood's
opinion as part of "all of the relevant evidence."  See
Alcantara v. Astrue, 257 F. App'x 333, 335 (1st Cir. 2007)
(citing 20 C.F.R. § 416.920(a), (c)).  Opinions from "other"
medical sources can provide information about the severity and
functional effects of an established impairment, 20 C.F.R. §
404.1513(d), particularly when the source has a treatment

---

[9] The Social Security Administration clarifies why the
regulations differentiate between "acceptable medical sources"
and "other sources."  SSR 06-3P, 2006 WL 2329939, at *2 (Aug. 9,
2006).  First, only "acceptable medical sources can establish
the existence of a medically determinable impairment.  Id.
(citing 20 C.F.R. § 404.1513(a)).  Second, only acceptable
medical sources can give medical opinions.  Id. (citing 20
C.F.R. § 404.1527(a)(2)).  Third, only acceptable medical
sources can be "treating sources."  Id. (citing 20 C.F.R. §§
404.1502, .1527(d)).

relationship with the plaintiff.  Agrusso v. Astrue, 2013 DNH
006, 22-23.  An ALJ cannot simply ignore the body of evidence
opposed to his view.  Dunn v. Apfel, No. CIV. 98-591-B, 1999 WL
1327399, at *8 (D.N.H. Dec. 10, 1999).  There is no error,
however, where the ALJ clearly considered a source's opinion
and, after evaluating the record including other acceptable
medical sources supporting the opposite conclusion, he or she
decided to discount the source's opinion.  See Russell v.
Barnhart, 2004 DNH 009, 24-25.  The weight given to other source
opinions varies depending on an assessment of multiple factors,
including the source's relationship with the claimant, its
consistency with other evidence, the amount of evidence used to
support its opinion, its explanation of the opinion, and its
knowledge of a specialty area or expertise.  Couitt v. Astrue,
2012 DNH 066, 14 (citing SSR 06-03p, 2006 WL 2329939, at *4-5
(Aug. 9, 2006)).

     The ALJ clearly considered Blood's treating relationship
with Corson, but also noted her opinion's retrospective
application.  Blood first examined Corson several years after
Corson's DLI and was privy to no medical evidence documenting
the existence of a delusional impairment prior to Corson's DLI.
Before discounting a retrospective opinion, an ALJ "must
consider whether it substantiates a disability that existed

during the eligible period or is corroborated by contemporaneous evidence." Sibley v. Astrue, 2013 DNH 022, 19 (citing Marcotte v. Callahan, 992 F. Supp. 485, 491 (D.N.H. 1997)).  Here, the ALJ correctly noted that the record contains no medical evidence of this impairment prior to 2002, despite the fact that throughout the eligible period Corson was frequently treated for other mental issues by her primary care providers.  Moreover, the ALJ sought out further testimony of a medical expert to assess whether the record substantiated a disability existing prior to Corson's DLI, and squarely discussed Corson's contemporaneous lay evidence in finding that substantial evidence supports a finding of no disability.

An ALJ is also required to examine "other source" testimony for its consistency with the record as a whole.  The ALJ clearly considered and gave significant weight to the treatment records existing prior to Corson's DLI and, as explained below, afforded limited weight to the lay testimony provided by Corson.  He also examined other post-DLI evidence in the record to assess its potential retrospective applicability.  In doing so, he permissibly found that the evidence does not substantiate a pre-DLI disability and is not sufficiently corroborated by contemporaneous evidence.

26

Not only did the ALJ find Blood's testimony inconsistent with the pre-DLI medical records and Corson's own explanations of her ailments, he also found it to be inconsistent with opinions from acceptable medical sources.  The ALJ credited Dr. Koocher, the medical expert, noting that he considered the entire record, including all lay testimony.  An ALJ is permitted to give significant weight to testimony from non-examining medical experts.  See Gray v. Heckler, 760 F.2d 369, 373 (1st Cir. 1985) (per curiam); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 130 (1st Cir. 1981); Rodriguez, 647 F.2d at 223-24.  This court has found such reliance to be particularly appropriate when, as here, the expert has viewed all of the claimant's medical records and where, as here, the record contains no other RFC assessment prepared by an acceptable medical source.  See Menezes v. Apfel, 2000 DNH 107, 40.  Moreover, "the fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source.'"  Hines v. Astrue, No. 11-cv-262, 2012 WL 2752192, at *10 (D.N.H. Jul. 9, 2012).  Blood's testimony is also inconsistent with an assessment by the state agency psychologist and with the findings of Dr. Meehan, who upon Blood's request examined

Corson's records and found "no history of earlier onset
psychosis."  Tr. at 393.  Although not dispositive, no
acceptable medical source found evidence of a delusional
impairment prior to the DLI.

In deciding the weight to allocate to an "other source"
opinion, an ALJ should also examine the amount of evidence and
adequacy of explanation used to support the opinion.  Here, the
ALJ found that Blood provided no clinical observations to
support her opinion.  Further, Blood did not explain her
retroactive opinion, which consisted of (1) a statement in 2003,
with no further explanation, that her diagnosis applied prior to
Corson's DLI; and (2) a second statement in 2006, again with no
explanation, reiterating her pre-DLI application.  The complete
absence of medical evidence establishing an impairment during
the eligible period makes Blood's unexplained statements that
much less credible.

Finally, an ALJ should also consider whether the source has
any specialty or expertise in the area concerned.  As a
psychiatric nurse practitioner specializing in mental health,
Blood undoubtedly has attained some level of related specialized
experience.  The ALJ accounted for Blood's specialty by
carefully considering her evidence as he would that of a
treating source, rather than summarily dismissing it.

Viewing each factor, it is clear that the ALJ afforded Blood's opinion both careful consideration and adequate weight. Moreover, the ALJ described the substantial evidence in the record opposing Blood's cursory retrospective diagnosis, and why substantial evidence favored a finding of no disability.  Here, the ALJ recognized that Blood may not be an acceptable medical source, but then "acknowledged (and complied with) his obligation to provide an explanation for his decision to give her opinions only limited weight."  See Rakip v. Astrue, No. 11-cv-323, 2012 WL 1884678, at *4 (D.N.H. May 23, 2012).  I thus find no error in the ALJ's weighing of medical opinions.

I emphasize that the record also contains substantial evidence supporting Corson's allegations of disabling mental impairments.  Given the stigma often associated with mental illness, I am particularly sensitive to the evidence concerning Corson's fear and reticence to broach the issue of a delusional disorder with her doctors.  It is the role of the ALJ, however, and not of this court, to weigh and resolve conflicts in the evidence.  See Rodriguez, 647 F.2d at 222 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  The record here arguably could justify a different conclusion, Lizotte, 654 F.2d at 129-31, but the ALJ's decisions in assessing the medical opinions were supported by substantial evidence.  There was no error.

B.    **Consideration of Lay Evidence**

Acknowledging that relevant evidence from "other sources"
also includes evidence from non-medical lay sources, 20 C.F.R. §
404.1513(d), I find that the ALJ adequately considered the lay
testimony presented by Corson's friends and relatives.  In his
decision, the ALJ addressed the lay evidence, discrediting some
testimony as describing an isolated incident from before the
alleged onset date, other testimony as failing to establish any
ongoing inability to maintain appropriate social interactions,
and still other testimony as indicating nervousness but no
overwhelming disability.  In summarizing the lay testimony, he
found that "[n]one of these statements support a conclusion that
[Corson] was suffering from additional limitations than have
been found herein."  Tr. at 451.  The ALJ's decision to give
little weight to the lay evidence is rooted in medical expert
testimony that Corson's impairments are episodic.  The lay
evidence fails to overcome the paucity of medical evidence
supporting a finding of a delusional impairment prior to
Corson's DLI.

C.    **RFC Finding**

Corson also argues that the ALJ's RFC finding was not
supported by substantial evidence.  Specifically, she argues
that Blood's opinion should be credited as supporting a much

more restricted RFC.  This argument is unavailing for the
reasons discussed above.  The ALJ gave adequate weight to
Blood's opinion.  An "other" medical source's opinion can be
given significant weight in limited circumstances, such as when
the other source has seen the claimant more frequently, has
provided better supporting evidence, and has better explained
his or her opinion.  SSR 06-3P, 2006 WL 2329939, at *3-5 (Aug.
9, 2006).  That is not the case here, however, where the "other
source" did not treat Corson before her DLI, provided little to
no supporting evidence tying Corson's current impairment to the
eligibility period, and failed to explain why her opinion
deserved retrospective application.  Because the ALJ properly
weighed Blood's "other source" opinion and explained in detail
the extent to which he discredited Corson's own testimony, he
was justified in omitting her alleged delusional impairments
from both the RFC and his questions to the vocational expert.[10]

---

[10] Corson also argues that the ALJ failed to include a functional
limitation relating to her ability to maintain regular work
attendance that was acknowledged by both Dr. Koocher and Blood.
The record shows no such agreement between Dr. Koocher and
Blood.  Rather, as the Commissioner notes, Dr. Koocher testified
that Corson's ability to attend work regularly would only be
moderately impaired, and that her depression and anxiety would
not interfere with her ability to complete a normal workweek.
Tr. at 663-64.  Dr. Koocher's testimony is thus in line with the
ALJ's findings.  Id. at 451-53.

### IV.   CONCLUSION

In his decision, the ALJ addressed the opposing evidence and chose to credit the only acceptable medical sources and the only medical evidence in the record relating to the period prior to the DLI, giving little weight to both Blood's "other source" opinion and the lay evidence.  He properly relied upon substantial evidence in the record to arrive at his decision.

For the foregoing reasons, I grant the Commissioner's motion to affirm (Doc. No. 11) and deny Corson's motion to reverse (Doc. No. 9).  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


November 1, 2013

cc:   Raymond J. Kelly, Esq.
      T. David Plourde, Esq.